UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                                                           Case No. 20-CR-162-PP-SCD

ISAIAH L. BEASLEY,

    Defendant.

---

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS FRUITS OF INVALID SEARCH WARRANT

---

The United States charged Isaiah Beasley and others with involvement in a drug-trafficking conspiracy and possessing a firearm in furtherance of that conspiracy. The charges stem from a local investigation into a drive-by shooting Beasley allegedly committed to settle a score over an unpaid drug debt. During that investigation, law enforcement obtained a state warrant compelling Snap Inc., the operator of the popular Snapchat web-based communication application, to turn over its records for two accounts others said Beasley was using around the time of the shooting.

Beasley has moved to suppress the fruits of that search, arguing that the warrant was not supported by probable cause because its supporting affidavit failed to establish a nexus between Beasley's alleged Snapchat accounts and any illegal activity.[1] The government opposes the motion. I find that the issuing judge had a substantial basis for concluding that probable cause existed to search Beasley's alleged Snapchat accounts and that Beasley has

---

[1] The defendant's motion does not specify what, exactly, the fruits of the complained-of search were.

failed to rebut the presumption that the executing officers relied on the warrant in good faith. Accordingly, I will recommend that Beasley's suppression motion be denied.

## BACKGROUND

In the early morning hours of May 4, 2019, someone fired shots into a Sheboygan duplex and then fled in a vehicle. ECF No. 38-1 at 6–7. Investigation revealed that the likely intended target of the shooting was a resident of the upper unit of the duplex and that the likely shooter was Isaiah Beasley, whom the resident owed money for cocaine. *Id.* at 7–8, 16. The resident told law enforcement that about a week prior to the shooting he received a text message from Beasley stating, "don't f*** with my money G." *Id.* at 7. Law enforcement knew Beasley from a prior investigation in which Beasley was charged with drug-trafficking and firearms offenses. *Id.* at 8. Investigation also revealed that Omar Sosa likely acted as Beasley's get-away driver and that Sosa and others, including Beasley and Sosa's brothers Irwin and Saul, sold large quantities of drugs in the Sheboygan area and throughout eastern Wisconsin. *Id.* at 11–20. Law enforcement later discovered a methamphetamine lab used to convert liquid meth into crystal meth in the basement of a residence associated with the Sosa brothers. *Id.* at 14.

On August 14, 2019, Dennis Carroll, a senior special agent with the Wisconsin Department of Justice, Division of Criminal Investigation, submitted a twenty-five-page "rolling affidavit" in support of his request to search several cell phones and other electronic communications. ECF No. 38-1 at 4–28. The application sought permission to search the Snapchat accounts linked to Beasley and the three Sosa brothers. *Id.* at 27–28. The affidavit indicates that the Sosa brothers—the alleged leaders of the drug-trafficking organization— communicated with others via Snapchat in the weeks after the shooting. A friend of Omar

2

Sosa told law enforcement that Omar asked him via Snapchat to pick up and hold onto a box of guns in exchange for cash. *Id.* at 13. One of the guns was reported stolen. *Id.* In a second interview with law enforcement, the friend stated that he retrieved the box from Omar's residence a few weeks after the shooting. *Id.* The friend also stated that he'd told Omar via Snapchat that he turned the box over to the police. *Id.* Similarly, a different associate of the Sosas told law enforcement that Irwin Sosa had fled to Mexico following the shooting. *See id.* at 15. She stated that Irwin had contacted her via Snapchat to ask if she could ship him Percocet pills. *Id.* She also stated that she told Irwin about her contact with law enforcement. *Id.*

The affidavit indicates that Beasley also used Snapchat. *See id.* at 18. For instance, Beasley's girlfriend told law enforcement on May 29, 2019, that she communicated with Beasley via Snapchat and that his username was "Zaethekid." *Id.* at 18. Also, an informant told Special Agent Carroll that he had seen Beasley in Milwaukee in July 2019, that he communicated with Beasley via Snapchat, and that Beasley was using the username "Zaetheman" in months prior to July 2019. *Id.*[2] Although the informant requested to remain anonymous, he or she appeared to have a prior relationship with law enforcement—the affidavit indicates that Special Agent Carroll had received reliable and accurate information from the informant in the past. *Id.*

Near the end of the affidavit, Special Agent Carroll provides general information about searching electronic devices and other electronic communications. *See id.* at 22–27. He explains that he was aware that drug traffickers and users often use cell phones to conduct

---

[2] The spelling in paragraph forty-seven of the affidavit, "Zaethman"—without the "e" in the middle—appears to be a typo. *See* ECF No. 38-1 at 1, 3, 27.

their business, including via direct calls, text messages, and social media. *Id.* at 23. Special Agent Carroll further explains that Snapchat "is increasing in popularity by persons [sic] involved with drug distribution as a secure means of communicating with sources of supply and customers." *Id.* at 27. He describes Snapchat as "a free web-based communication service accessed from smartphones and computers from a company called Snap Inc." *Id.* at 27. He notes, "The Snapchat system is designed to allow people to share photos and communicate. Snapchat is unique in that it deletes the chats and images after the recipient has viewed the image and/or message." *Id.* According to Special Agent Carroll, "[t]he information sought from Snapchat will assist in identifying communication detail and in linking, connecting and corroborating people as a part of the [drug-trafficking organization] and shooting investigation." *Id.*

The Honorable Kent Hoffman, a Sheboygan County Circuit Court Judge, authorized the warrant the same day Special Agent Carroll submitted his affidavit. *See* ECF No. 38-1 at 1–2. The warrant compelled Snap Inc. to turn over its records from January 1, 2018, through August 12, 2019, for the Snapchat accounts allegedly used by Beasley and the Sosa brothers. *Id.* at 1. Special Agent Carroll subsequently confirmed that Snapchat provided him the requested records. *See* ECF No. 38-1 at 3. However, it's unclear what evidence or leads law enforcement acquired from them.

On September 9, 2020, a grand jury sitting in the Eastern District of Wisconsin returned an indictment against Beasley and six others. *See* ECF No. 1. Beasley is charged in two of the three counts: Count One charges Beasley and the others with knowingly and intentionally conspiring to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), (C), (D), and 846; Count Two charges Beasley (and Omar Sosa)

4

with knowingly using, carrying, and discharging a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). *See id.* at 1–3. Beasley was arraigned on the charges and entered a plea of not guilty. *See* ECF No. 20. The matter is assigned to U.S. District Judge Pamela Pepper for trial and to me for resolving pretrial motions. *See* 28 U.S.C. § 636; Fed. R. Crim. P. 59; E.D. Wis. Gen. L. R. 72. The case has not yet been scheduled for trial.

On June 25, 2021, Beasley filed a motion seeking an order suppressing the government's use of fruits of the Snapchat warrant. *See* ECF No. 38. The government responded to the motion on July 16, 2021. *See* ECF No. 49. On July 22, 2021, Beasley submitted his reply. *See* ECF No. 51.

## DISCUSSION

Beasley argues that all the fruits of the search of his alleged Snapchat accounts should be suppressed because the affidavit submitted in support of the search warrant was not supported by probable cause. The government argues that the search-warrant affidavit was not deficient and that, even if it were, the executing officers relied on the warrant in good faith.

### I. Probable cause

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "When an affidavit is the only evidence presented to a judge in support of a search warrant, the validity of the warrant rests solely on the strength of the affidavit." *United States v. Peck*, 317 F.3d 754, 755–56 (7th Cir. 2003).

5

"A search warrant affidavit establishes probable cause when it 'sets forth facts sufficient to induce a reasonable prudent person to believe that a search thereof will uncover evidence of a crime.'" *United States v. Jones*, 208 F.3d 603, 608 (7th Cir. 2000) (quoting *United States v. McNeese*, 901 F.2d 585, 592 (7th Cir. 1990)). In deciding whether an affidavit establishes probable cause, "courts must use the flexible totality-of-the-circumstances standard set forth in *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983)." *McNeese*, 901 F.2d at 592. Applying the totality-of-the-circumstances standard,

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Gates*, 462 U.S. at 238.

"[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts." *Gates*, 462 U.S. at 232. Thus, "[i]n dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States,* 338 U.S. 160, 175 (1949). "Probable cause denotes more than mere suspicion, but does not require certainty." *United States v. Anton*, 633 F.2d 1252, 1254 (7th Cir. 1980).

The court's duty in reviewing a search warrant and its supporting materials is limited to ensuring "that the magistrate had a 'substantial basis for . . . [concluding]' that probable cause existed." *Gates*, 462 U.S. at 238–39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). In other words,

> a magistrate's determination of probable cause is to be "given considerable weight and should be overruled only when the supporting affidavit, read as a

whole in a realistic and common sense manner, does not allege specific facts and circumstances from which the magistrate could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated."

*United States v. Pritchard*, 745 F.2d 1112, 1120 (7th Cir. 1984) (quoting *United States v. Rambis*, 686 F.2d 620, 622 (7th Cir. 1982)). Even "doubtful cases should be resolved in favor of upholding the warrant." *Rambis*, 686 F.2d at 622.

Beasley maintains that the search-warrant affidavit failed to establish "a nexus" between his alleged Snapchat accounts and criminal activity. ECF No. 38 at 1 (quoting *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967)). His reliance on *Hayden*, however, is slightly off base. The "nexus" principle quoted in *Hayden* "is not the holding of the case, and the case did not even involve a warrant." *Hale v. United States*, No. 1:08 CV 94, 2010 WL 2921634, 2010 U.S. Dist. LEXIS 73604, at *61–62 (N.D. Ill. July 22, 2010). And unlike other circuits, the Seventh Circuit generally does not discuss *Hayden* in warrant cases. *See id.* at *62 n.28. Rather, requiring a nexus to criminal activity in a warrant is simply another way of saying that the warrant must "allege specific facts and circumstances that reasonably lead to the belief that the items sought in the search warrant are likely to be located in the place to be searched." *United States v. Hobbs*, 509 F.3d 353, 361 (7th Cir. 2007) (citing *Gates*, 462 U.S. at 238; *United States v. Wiley*, 475 F.3d 908, 914–15 (7th Cir. 2007)).

The Seventh Circuit "has consistently held that, for a search warrant, probable cause 'does not require direct evidence linking a crime to a particular place.'" *United States v. Zamudio*, 909 F.3d 172, 175 (7th Cir. 2018) (quoting *United States v. Anderson*, 450 F.3d 294, 303 (7th Cir. 2006)). "Rather, issuing judges may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the offense." *Zamudio*, 909 F.3d at 175–76 (citing *United States v. Orozco*, 576 F.3d 745, 749 (7th Cir. 2009); *United*

7

*States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991)). "Thus, an affidavit submitted in support of a warrant application 'need only contain facts that, given the nature of the evidence sought and the crime alleged, allow for a reasonable inference that there is a fair probability that evidence will be found in a particular place.'" *Zamudio*, 909 F.3d at 176 (quoting *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010)). For example, the Seventh Circuit has recognized that, "[i]n the case of drug dealers, evidence is likely to be found where the dealers live." *Lamon*, 930 F.2d at 1188 (quoting *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986)).

Accordingly, the issue here is whether Special Agent Carroll's affidavit provided the issuing judge sufficient information suggesting a fair probability that evidence of a crime would be found within Beasley's alleged Snapchat accounts. I find that it did.

*First*, the affidavit establishes a reasonable probability—and it is not really in dispute—that Beasley was an active drug dealer who shot up the residence of a customer who failed to pay a drug debt. A resident of the upper unit of the targeted duplex told law enforcement that "he was very certain" that Beasley was the person who shot at his residence, as he owed Beasley money for a cocaine deal, and the week prior to the shooting he received a text from Beasley stating, "don't f*** with my money G." ECF No. 38-1 at 7. Subsequent information, including statements from an individual who admitted to helping Beasley and Omar Sosa (the get-away driver) destroy evidence related to the shooting, corroborated the fact that Beasley shot at the duplex in retaliation for the resident's failure to pay up. The investigation also suggested that Beasley was closely associated with the Sosa brothers, who were credibly believed to be operating a large drug-trafficking organization in the Sheboygan area. And

8

Special Agent Carroll knew from a prior investigation that Beasley had a history of drug-trafficking and firearm offenses.

Without disputing any of these allegations, Beasley contends that the search warrant is invalid because it does not specify the crime(s) for which the search was authorized. However, the affidavit clearly establishes probable cause to believe that Beasley committed the drive-by shooting and was involved in the distribution of controlled substances. Moreover, it describes with particularity the information to be turned over by Snap Inc. Beasley does not cite any authority finding a similar warrant facially invalid for failure to list the specific crimes under investigation.

*Second*, given the totality of the circumstances, the issuing judge reasonably drew the inference that there was a fair probability that evidence relating to the shooting and the trafficking of drugs would be found within Beasley's Snapchat accounts. The affidavit indicates that, after the shooting, Omar and Irwin Sosa communicated with others via Snapchat about law enforcement's investigation of the shooting and its aftermath. The affidavit also indicates that, around the time of the shooting, Beasley used Snapchat to communicate with others. Although the affidavit does not specifically allege that Beasley used Snapchat to conduct criminal activity, it didn't need to: here, the judge knew that: (1) drug dealers often use Snapchat to conduct business, particularly because Snapchat deletes messages automatically, (2) Beasley's own associates used Snapchat to conduct business, and (3) Beasley himself used Snapchat. These facts take the question far beyond mere speculation and establish a convincing likelihood that Beasley's Snapchat accounts would have contained evidence of criminal activity. In fact, given that his associates used Snapchat to conduct

9

activities relating to drug dealing (retrieving hidden guns and shipping Percocet pills), it would be surprising if Beasley would *not* have used Snapchat for that purpose as well.

And unlike similar cases where probable cause was found to be lacking, *see, e.g.*, *United States v. Marroquin*, No. 6:19-CR-31-CHB-HAI-6, 2020 WL 7016990, 2020 U.S. Dist. LEXIS 203287, at *10–13 (E.D. Ky. July 10, 2020), law enforcement here had specific information linking Beasley to two different Snapchat usernames. Viewed together, these facts provided a substantial basis for the issuing judge to believe that a search of Beasley's Snapchat accounts would yield evidence of a crime—e.g., messages, images, contacts, or witnesses.

Beasley argues that police could not reasonably have expected to find evidence relating to the shooting by searching Snapchat information that predated the shooting by several months—the warrant authorized the search of records between January 1, 2018, and August 12, 2019. Although Beasley has a point, his objection largely misses the mark. Police were not limited to searching for information about the shooting itself; the affidavit describes a sweeping investigation into illegal drug-trafficking activity in general. Beasley does not explain why it would be unreasonable to believe that evidence of drug activity would exist as early as January 2018.

Beasley also protests that a finding of probable cause in this case would amount to a categorical rule allowing searches of social media accounts whenever a suspect is implicated in drug activity. The Seventh Circuit has "repeatedly rejected" categorical rules, noting over and over that probable cause is a common-sense analysis based on the totality of the circumstances present in each case. *Zamudio*, 909 F.3d at 176–77 (citing *Wiley*, 475 F.3d at 916). The fact that courts will usually (if not categorically) find probable cause to search social media accounts when the suspect is a drug dealer doesn't mean it's a categorical rule or lead-

10

pipe cinch: here, the probable-cause finding is based on the particular facts and circumstances of this case, with the appropriate deference given to the issuing judge. A common-sense recognition that drug dealers communicate on social media does not amount to a categorical rule.

Beasley also argues that the affidavit fails to demonstrate the reliability of the two informants. The Seventh Circuit applies the *Illinois v. Gates* totality-of-the-circumstances test to warrant affidavits "based on an informant's report." *United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014). "Reliability, veracity, and basis of knowledge are all 'highly relevant,' but the totality-of-the-circumstances approach means 'a deficiency in one may be compensated for . . . by some other indicia of reliability.'" *Glover*, 755 F.3d at 816 (quoting *Gates*, 462 U.S. at 230, 233). Courts weighing the totality of the circumstances in informant cases typically consider five factors: "the level of detail, the extent of firsthand observation, the degree of corroboration, the time between the events reported and the warrant application, and whether the informant appeared or testified before the magistrate." *Glover*, 755 F.3d at 816 (citing *United States v. Johnson*, 655 F.3d 594, 600 (7th Cir. 2011)).

Beasley seems to suggest that, to be reliable, the informants had to link his alleged Snapchat accounts to criminal activity. But the affidavit doesn't rely on the informants to provide any such link. Rather, the informants offered only two pieces of information, both of which were crucial: (1) around the time of the shooting, Beasley was using Snapchat to communicate with others; and (2) Beasley's Snapchat usernames. And the affidavit provided a sufficient basis as to the reliability of that information. The first informant, Beasley's alleged girlfriend at the time, was interviewed on May 29, 2019—that is, less than four weeks after the shooting. She told law enforcement that she had been communicating via Snapchat with

11

Beasley, who was using the username "Zaethekid." ECF No. 38-1 at 18. This information was based on first-hand knowledge, was provided about eleven weeks prior to the warrant application, and contained as much detail as was needed to pin down Beasley's use of Snapchat.

The second informant also provided information based on first-hand knowledge and provided adequate detail. The informant told law enforcement that he or she communicated with Beasley via Snapchat under the username "Zaetheman." *Id.* Although the informant was not named in the affidavit, he or she was known to law enforcement and, according to Special Agent Carroll, had provided reliable and accurate information in the past. Also, while the affidavit does not mention when Special Agent Carroll spoke with the second informant, it must have been within a few weeks of his submission of the warrant application on August 14, 2019, as the informant stated that he or she had seen Beasley in Milwaukee in July 2019. Finally, a fair reading of the affidavit suggests that the informant volunteered the username "Zaetheman," rather than simply confirming something an officer told him or her, which lends the informant extra credibility. *Id.*

The fact that the two informants provided different usernames for Beasley does not detract from the reliability of their information. The similarity in the names—"Zaethekid" vs. "Zaetheman"—suggests that they were used by the same person. Also, the root of both names, "Zae," is a common nickname for Isaiah. And just as it is not uncommon for drug dealers to possess and use multiple cellphones, it is not unreasonable to believe that Beasley was using two Snapchat accounts at the same time—especially given that two informants said he was.

Finally, Beasley argues that Special Agent Carroll's conclusory and general statements about Snapchat's use by drug dealers are insufficient to show probable cause. First, I do not agree that the statements were conclusory. Instead, the affidavit contains the statement of a special agent / police officer with nearly twenty years of law enforcement experience, who indicated that "Snapchat is increasing in popularity by persons [sic] involved with drug distribution as a secure means of communicating with sources of supply and customers." ECF No. 38-1 at 5, 27. This statement not only explains *that* Snapchat is popular with drug dealers, but it also explains *why* it is (secure communications). Second, and more importantly, the statement echoes other assertions that the Seventh Circuit has found sufficient to justify searching a drug dealer's home. In *Zamudio,* for example, the court relied on the agent's "experience and training," and the fact that "he asserted that drug traffickers generally store their drug-related paraphernalia and maintain records relating to their drug-trafficking at their residences—a fact we too have recognized." *Zamudio*, 909 F.3d at 176. The *Zamudio* court cited *United States v. Orozco*, 576 F.3d 745, 749 (7th Cir. 2009), noting that in *Orozco* the "magistrate judge was entitled to credit the FBI agent's lengthy experience and high degree of confidence that the sought-after evidence was likely to be found at the defendant's home."

The same should hold true here. It's true that we're not talking about a search of Beasley's home, but the parallel between a drug dealer's home and his social media account is obvious. Drug dealing often involves storing contraband and weapons, and so it makes sense that "evidence is likely to be found where the dealers live." *Lamon,* 930 F.2d at 1188. Drug trafficking also relies heavily upon the dealer's ability to communicate with suppliers and customers. Communication media, including social media, are likely to contain evidence about illegal activity—perhaps even more likely than a dealer's home. That does not mean

that they *always* will, and it doesn't mean that police may obtain a search warrant without explaining the connection. But it does mean that, as with dealers' homes, the connection may be based on an experienced officer's knowledge that a given social medium may be used by drug dealers generally.

Lastly, the affidavit is based on more than the agent's statement that Snapchat is popular with drug dealers. The affidavit provides detailed information linking Beasley to the drive-by shooting and the trafficking of controlled substances. The affidavit also indicates that, around the time of the shooting, Beasley was using Snapchat to communicate. At least two of his associates were using it to conduct illegal activity. ECF No. 38-1 at 13, 15. Just as courts in the past have found it reasonable to credit police officers' experience that drug dealers keep evidence in their homes, it is equally reasonable in the social media era to believe that such evidence will be found on social media accounts credibly tied to the suspect. And given Snapchat's defining feature—messages that disappear after being viewed—it's unsurprising that the application is a popular choice among drug dealers.

Accordingly, I find that the issuing judge had a substantial basis for concluding that probable cause existed to search the two Snapchat accounts linked to Beasley.

**II.    Good-faith exception**

"A faulty warrant and an illegal search do not necessarily entitle a defendant to suppression of evidence." *United States v. Woolsey*, 535 F.3d 540, 546 (7th Cir. 2008) (citing *United States v. Mykytiuk*, 402 F.3d 773, 777 (7th Cir. 2005)). "The Supreme Court announced in [*United States v. Leon*, 468 U.S. 897 (1984)], that suppression is inappropriate if the police officers who executed a later-invalidated search warrant did so in good faith." *Woolsey*, 535 F.3d at 546. "An officer's decision to obtain a warrant is prima facie evidence of good faith."

*Id.* (citing *United States v. Otero*, 495 F.3d 393, 398 (7th Cir. 2007); *Mykytiuk*, 402 F.3d at 777). A defendant may rebut this presumption by showing (1) "that the judge who issued the warrant abandoned his neutral, detached role and acted as a rubber stamp for the police"; (2) "that the affiant intentionally or recklessly misled the judge"; (3) "that the supporting affidavit is so lacking in indicia of probable cause that an officer's belief in its existence would have been entirely unreasonable"; or (4) "that the warrant itself is so facially deficient that the executing officers could not reasonably have believed it to be valid." *Woolsey*, 535 F.3d at 546 (citing *Leon*, 468 U.S. at 923; *Otero*, 495 F.3d at 398).

Even if the warrant in this case were invalid, I would still recommend that Beasley's suppression motion be denied because Beasley has failed to rebut the presumption that the executing officers relied on the warrant in good faith. Beasley contends that the issuing judge rubber stamped the warrant, which he claims was supported by a "bare bones" affidavit. He focuses on the two paragraphs in the affidavit in which his alleged girlfriend at the time and an unnamed informant told law enforcement about Beasley's use of Snapchat. But, as recounted above, the affidavit contains significant information beyond those two paragraphs that link Beasley to criminal activity and provide a reasonable inference as to where evidence related to those crimes would be found.

Beasley also spends much time discussing what's lacking in the affidavit. However, the analysis in deciding a motion to suppress "center[s] on 'the adequacy of what the affidavit does contain, not on what it lacks, or on what a critic might say should have been added.'" *Marroquin*, 2020 U.S. Dist. LEXIS 203287, at *6–7 (quoting *United States v. Dyer*, 580 F.3d 386, 391 (6th Cir. 2009)). Thus, even if the affidavit could have done more to link Beasley's use of Snapchat to the crimes under investigation, the affidavit gives rise to at least some

15

degree of probable cause to search his two Snapchat accounts. Indeed, in similar cases where probable cause was found inadequate, courts have declined to suppress the evidence under *Leon*. *See, e.g.*, *Marroquin*, 2020 U.S. Dist. LEXIS 203287, at \*13–20 (applying *Leon* to search warrant that failed to provide nexus between criminal activity and the defendant's Facebook account); *United States v. Propps*, No. 4:18-cr-00003, 2019 WL 668465, 2019 U.S. Dist. LEXIS 25789, at \*12–15 (N.D. Ga. Feb. 19, 2019) (same); *United States v. Whitt*, No. 1:17cr060, 2018 WL 447586, 2018 U.S. Dist. LEXIS 7420, at \*5–11 (S.D. Ohio Jan. 17, 2018) (same). The good-faith exception would therefore save the warrant even if I had declared it invalid.

## CONCLUSION

For all the foregoing reasons, it is **RECOMMENDED** that Isaiah Beasley's motion to suppress fruits of invalid search warrant, ECF No. 38, be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C), Fed. R. Crim. P. 59(b), and E.D. Wis. Gen. L. R. 72(c), whereby written objections to any recommendation herein, or part thereof, may be filed within fourteen days of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district judge shall result in a waiver of your right to appeal. If no response or reply will be filed, please notify the district judge in writing.

Dated at Milwaukee, Wisconsin, this 2nd day of August, 2021.

STEPHEN C. DRIES
United States Magistrate Judge